# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 3156 | **DATE** | 5/14/2004 |
| **CASE TITLE** | Long vs. American Medical Association | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> Defendant's Motion for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    For the reasons set forth in the attached memorandum opinion, Defendant's Motion for Summary Judgment [Doc. 8] is GRANTED in part and DENIED in part.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | |
|---|---|
| No notices required, advised in open court. | |
| No notices required. | number of notices |
| Notices mailed by judge's staff. | |
| Notified counsel by telephone. | MAY 17 2004 date docketed |
| ✓ Docketing to mail notices. | docketing deputy initials |
| Mail AO 450 form. | |
| Copy to judge/magistrate judge. | date mailed notice |

| jar(lc) | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials |
|---|---|---|---|---|

**Document Number**

17

DOCKETED

MAY 17 2004

ERMA LONG                           )
                                    )
                                    )    No. 03 C 3156
             Plaintiff,             )
                                    )    HONORABLE DAVID H. COAR
        v.                          )
                                    )
AMERICAN MEDICAL ASSOCIATION        )
                                    )
             Defendant.             )

## MEMORANDUM OPINION AND ORDER

Plaintiff Erma Long has filed a two-count Complaint against Defendant American
Medical Association. Count I of the Complaint alleges two distinct claims of racial
discrimination in the terms of conditions of her employment and one claim of retaliation for
complaints of race discrimination. Each of those claims, if proved, would be a violation of Title
VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. The racial discrimination claims in
Count I allege that Defendant discriminated against her on the basis of race: (a) when she
received a low salary increase in April 2001; and (b) when the Defendant eliminated her position
and terminated her employment on September 30, 2001. The retaliation claim of Count I alleges
that her employment was terminated on September 30, 2001 in retaliation for her complaints of
racial discrimination. Count II of the Complaint alleges that the Defendant unlawfully
eliminated her position and terminated her employment on September 30, 2001 because of her
age (49); that claim, if proved, would be a violation of the Age Discrimination in Employment
Act, 29 U.S.C. § 621.

This case comes before the Court on Defendant American Medical Association's Motion

1

17

for Summary Judgment. The Defendant asserts that Plaintiff is unable to marshal sufficient evidence to proceed to a jury on any of the four grounds for relief outlined in her Complaint. For the reasons set forth in this opinion, Defendant's motion is granted in part and denied in part.

## I.    GENERAL BACKGROUND FACTS[1]

Plaintiff Erma Long ("Plaintiff" or "Long") is an African-American woman.[2] Plaintiff worked for Defendant American Medical Association ("Defendant" or "AMA") from February 14, 1983 until September 30, 2001. In December 1997, Plaintiff was promoted to the position of Manager, VP Publishing and Special Projects. She retained this position until the time of her termination. During Plaintiff's tenure at the AMA, she consistently received "superior" or "exceptional" ratings for her job performance. Long's personnel file demonstrates an 'enviable record of favorable appraisal ratings." (Pl. St. Add'l Uncontested Facts, ¶ 128.)

On February 15, 2001, Long's supervisor, Robert Kennett ("Kennett") received a memo from Robert A. Musacchio ("Musacchio"), the Senior Vice President of Publishing and Business Services, informing him that he was going to be demoted. The memo asserted that under Kennett's leadership, the AMA publishing department experienced poor financial performance and failed to meet administrative deadlines. The memo also indicated that Musacchio selected Peter Payerli ("Payerli") to assume the role of Interim Vice President of Publishing effective April 1, 2001. The AMA announced these changes to its personnel on March 15, 2001.

---

[1] These are facts that are germane to all the claims of the Plaintiff's Complaint. The Court will address the specific facts that are unique to certain claims within the discussion of those claims.
[2] Unless otherwise noted, these are undisputed facts that are set forth in the parties' Local Rule 56.1 Statements of Uncontested Facts.

Also during February 2001, Payerli had a meeting with Musacchio. At that meeting, Musacchio told Payerli that he wanted Payerli to "energize and motivate and to change the way that the AMA did business." According to Musacchio, the underlying goals of this vague directive were to move the publishing department from a print- and display-based business to the electronic front and other revenue sources. (Pl. Appendix, Tab E at 36.)

On March 16, 2001, Payerli met with Peggy Evans ("Evans"), the Director of Employment Services in the AMA Human Resources Department to discuss Long's position. Payerli reported to Evans that he wanted to "send [Long] w/Kennett in his new role. . . ." (Pl. Appendix, Tab D.) Payerli also expressed concerns to Evans about Long's behavior and her ability to work with other employees. Payerli told Evans that he had observed Long verbally abusing administrative staff, and he felt that there was a "pervasive hum of . . . how-difficult-it-is-to-work-with-[Long] sentiment." (Pl. Appendix, Tab C at 196.) Long denies that there is any truth to these criticisms of her performance, but she admits that Payerli expressed the concerns to Evans. Evans told Payerli that if Long had performance problems, this should be communicated to her and she should be given an opportunity to improve.

On April 12, 2001, Payerli and Evans met again to discuss Long. At that meeting, Payerli told Evans that he felt Long's position should be eliminated. Evans' notes from the meeting reflect that Payerli registered concerns about Long's ability to work with the group.

It was the practice of the AMA to give annual salary increases which were effective on April 1 of each year. The AMA issued its Compensation Management Guidelines ("guidelines") for 2001 on March 15, 2001. The guidelines informed the Executive Staff that the pay decisions for 2001 were limited by an maximum overall four percent payroll increase. The guidelines included criteria for the executives to use in making individual salary decision. Among the

3

criteria in the guidelines were "performance criteria" and "salary range criteria." The guidelines also included a grid that set forth recommended increase percentages that varied based on the employee's performance rating and salary range.

Following Payerli's appointment as interim VP Publishing, he became responsible for determining the salary increases of the employees in the publishing department in 2001. Based on Long's performance review from 2000 and her salary placement, the guidelines recommended a salary increase for her of four to eight percent in 2001. Payerli approved a 3.5 percent salary increase for Long.

Long learned of her 3.5 percent salary increase when she got her monthly paycheck on April 30 or May 1, 2001. Long went to Payerli's office to discuss her disappointment with the pay increase. She told Payerli that she was disappointed and that she felt unappreciated as an employee because her salary increase was below the guideline recommendation. Payerli thanked her for her comments and ended the meeting.

On May 1, 2001, Long went to see Peggy Evans in the Human resources Department to discuss her disappointment with her salary increase. Long informed Evans that she believed the increase reflected racial discrimination and that Payerli was unwilling to discuss the matter with her because she was black. Long told Evans that she believed minority employees in publishing were getting lower salary increases than white employees. Evans advised Long that if she wished to file a formal race discrimination charge, she would have to talk to the Senior Vice President of Human Resources, Rhonda Rhodes, or the Executive Vice President, Dr. Ratcliffe Anderson.

On May 4, 2001, Long met with Rhonda Rhodes and conveyed her concern that her salary increase was the result of racial discrimination. Rhodes told Long she would investigate

her concerns. Long and Rhodes met a second time on May 7, 2001 to discuss Long's allegation. At Rhodes' request, Long prepared a chart setting forth the data on which she based her belief that she had been treated differently because of her race. Based on Long's chart, Rhodes asked one of her employees in Human Resources to run a report concerning the salary increases received by different groups of employees in the Publishing Department. Based on her further investigation, Rhodes concluded that "it appeared . . . that African-Americans were not receiving average increases that were lower than other groups by race." (Pl. Appendix, Tab I at 60.)

Rhodes met with Payerli on May 14, 2001 to discuss the situation with Long. Prior to this meeting, Rhodes had not met with Payerli to discuss Long's allegations of racial discrimination. Payerli's first statement when he went into Rhodes' office for the May 14 meeting was that he was aware Long had "called him a racist." Payerli told Rhodes that Long's performance did not justify a raise higher than she was given. (Pl. Appendix, Tab I at 31.)

On June 1, 2001, Long attended a meeting with Payerli and Evans at which she was informed that her position was being eliminated effective September 1, 2001. At that meeting, Payerli told Long that her duties would be absorbed by at least one other employee.[3] At that time, Payerli did not know Long's age. Later on June 1, 2001, Long met with Evans alone. Long asked whether her position was being eliminated because she complained of racial discrimination. Evans told Long that the elimination had been in the works since before Long complained of racial discrimination, but Evans was unable to discuss it with her at the time of her complaint.

Long met with Rhodes on June 5, 2001. Long told Rhodes that her job was going to be

---

[3] The parties dispute whether Payerli informed Long that a single employee or multiple employees would absorb Long's duties.

eliminated and that she believed it was in retaliation for her complaint. Rhodes told Long that the elimination of her position was not caused by her complaint of discrimination. At the time of this meeting, however, Rhodes had made no investigation of Long's retaliation claim.

Between June 1 and September 1, 2001, Long interviewed for three positions elsewhere in the AMA but she was not offered any of the three positions. In late August 2001, Long was informed that the AMA had agreed to extend her employment an additional thirty days to September 30, 2001 in order to give her more time to find a position within the organization. Long was unable to obtain employment within the organization within those additional thirty days.

On February 14, 2002, Long filed a Charge of Discrimination with the EEOC. In her charge, she alleged that she had been the victim of racial discrimination, age discrimination, and unlawful retaliation. In particular, she alleged that her 3.5 percent salary increase in April 2001 was a result of racial discrimination; her firing was in retaliation for her complaint of racial discrimination; and that her firing was a result of age discrimination. Long received a right to sue letter from the EEOC and subsequently filed this lawsuit.

The Defendant now seeks summary judgment on Plaintiff's Complaint.

## II.   SUMMARY JUDGMENT STANDARD

### A.   General Standard for Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Michael v. St. Joseph County, et. al, 259 F.3d 842, 845 (7th Cir. 2001). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable

inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Michael, 259 F.3d at 845; Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001). To successfully oppose the motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, see Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, see Albiero, 246 F.3d at 932. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552-53. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250.

## B.    Summary Judgment Standard for Discrimination Cases

Plaintiff's allegations of age discrimination, racial discrimination, and retaliation are all evaluated with the same analytical framework. See Cerutti v. BASF Corp., 349 F.3d 1055, 1061 n.4 ("We employ essentially the same analytical framework to employment discrimination cases whether they are brought under the ADEA, Title VII, or § 1981." (citing Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1088 (7th Cir.2000); Vakharia v. Swedish Covenant Hosp., 190 F.3d 799,

7

806 (7th Cir.1999)). In an employment discrimination case, the plaintiff may proceed under either the direct or indirect methods to prove her allegations of discrimination. See Cerutti v. BASF Corp., 349 F.3d 1055, 1060 (7th Cir. 2003). Under the direct method of proof, a plaintiff may show, by way of direct or circumstantial evidence, that the employer's decision to take an adverse job action was motivated by an impermissible purpose, such as race, national origin, or age. Id. at 727. Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer. See Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir.2003). The indirect method, also called the burden-shifting method, requires the plaintiff first to make out a prima facie case of discrimination through establishment of the following four factors: (1) plaintiff had membership in a protected class, or, for retaliation cases, engaged in action protected by Title VII; (2) plaintiff was meeting the employer's legitimate employment expectations; (3) plaintiff suffered an adverse employment action; (4) similarly situated employees outside of the protected class were treated more favorably by the employer. If a plaintiff proceeding under the indirect method of proof fails to establish all four factors in the prima facie case, summary judgment should be entered for the defendant. If the plaintiff establishes the prima facie case, the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reasons for the adverse employment action. If the defendant offers a legitimate, non-discriminatory reason for the adverse employment action, the burden returns to the plaintiff to "rebut that explanation by presenting evidence sufficient to enable a trier of fact to find that the employer's proffered explanation is pretextual [i.e., a lie]." Peele v. Counry Mut. Ins. Co., 288 F.3d 319, 326 (7th Cir. 2002).

## III. LONG'S RACE DISCRIMINATION CLAIM

Plaintiff contends that Defendant gave her a low salary increase in April 2001 because of

her race. Plaintiff also contends that Defendant terminated her because of her race. The two claims require the same legal analysis, but because the factual bases for the claims are different, the Court will examine them separately.

## A. Claim of Discrimination in Salary Increase

Long contends that she can establish race discrimination with respect to her salary increase through the direct or the indirect method of proof. The only evidence that she marshals under the direct method of proof is Payerli's statement to Rhodes on May 14, 2001 that he knew Long had "called him a racist." Long asserts that this evidences Payerli's propensity to rely on race in his decision-making. This remark does not "reflect a propensity by the decision maker to evaluate employees based on illegal criteria." Sheehan v. Donlan Corp., 173 F.3d at 1044 (7th Cir. 1999). What it does reflect, however, is that Payerli was aware of Long's allegations prior to his May 14 meeting with Rhodes. Awareness of Long's allegation of racial discrimination, without more, would be insufficient evidence to get the claim to the jury. Since that is the only direct evidence of discrimination that Plaintiff offers, she cannot prevail under the direct method of proof at this stage.

Under the indirect method of proof, Plaintiff would have to make out a prima facie case using the four elements outlined in the standards section above. If she can do so, then the Defendant would have to supply a legitimate, non-discriminatory reason for her lower salary increase. If Defendant provides that, the burden shifts back to Plaintiff to provide evidence that the reason is a pretext.

## 1. Plaintiff's Prima Facie Case

For the purposes of this motion, there is no dispute that Long was a member of a protected class, that she was meeting her employer's legitimate expectations, and that her raise

9

of 3.5 percent was an adverse employment action. The only dispute between the parties is to whether there were similarly situated employees outside of the protected class who were treated more favorably.

The first bone of contention between the parties on this issue is whether the group of similarly situated employees should consist of all the employees in the Publishing Department or only those employees who directly reported to Payerli. As Interim VP, Payerli had sole responsibility for determining the salary increases of the employees who reported directly to him. Payerli also was responsible for reviewing and approving the salary increases for those employees in the department who did not report directly to him. Additionally, Payerli had responsibility to ensure that the department as a whole did not exceed the 4 percent cap on payroll increases.

Although Payerli retained authority to review the increases submitted by lower-level managers, the Court finds that the proper scope of the similarly situated employees is those that Payerli was the sole decision-maker on their salary increases. Payerli's role in reviewing and approving the salary increases recommended by other managers is sufficiently different from his role in setting the salary increase to exclude those other employees from the group. If there were any evidence in the record that Payerli rejected or altered salary increases that other managers recommended to him, the Court would be inclined to evaluate those cases as well because they would implicate Payerli as a decision-maker, but there is no such evidence in the record.

When Payerli became Interim VP, he had seven employees reporting directly to him: Mark Kuhns, Peter Murphy, Jim Clinton, Vanessa Hayden, Crystal Wells, Christine Hearne, and Long. Due to a vacant management position beneath him, Payerli also was the decision-maker for three additional employees: Robert Herling, Bina Oza, and Norm Frankel. Of those ten

employees, all are white except for Bina Oza, who is of Indian descent, and Plaintiff, who is African-American.

Within this group of ten employees, Plaintiff is the only one in her protected class. The Defendant implies that Bina Oza should be considered in the same class as Plaintiff because she is not white, but that makes the class of similar employees too broad. Plaintiff is not claiming that she was discriminated against because she was not white, she is claiming that she was discriminated against because she was African-American. Because Bina Oza is not African-American, she is not in the same protected class as Plaintiff.

It is difficult to draw searching conclusions based upon comparisons to a class of one, but we must try. Eight of the nine employees that are similarly situated to Plaintiff with respect to their salary increase received raises that were within or above the range that the guidelines recommended. Only one of the other employees, Robert Herling, received a salary increase that was below the range the guidelines recommended. The Plaintiff has clearly met her burden of showing that similarly situated employees outside of her protected class were treated more favorably than she was. Consequently, she has established a prima facie case of discrimination.

### 2. Defendant's Non-Discriminatory Reasons

The Defendant offers several non-discriminatory reasons for Plaintiff's salary increase of 3.5 percent. First, as a general matter, it asserts that the guidelines established a range of acceptable increases to guide the decision-makers discretion in determining the increase, but they did not establish a mandatory minimum increase. Defendant contends that the salary increase Payerli set for Long was within his discretion.

Next, Defendant relies on the reasons Payerli provided for setting Long's salary increase

11

at 3.5 percent. Payerli asserts the following reasons: he concluded that Long's job was redundant; he disagreed with her performance rating from the previous year; he needed to conserve money to provide above-Guidelines increases to other, more valuable employees while remaining within the 4 percent overall cap.

These are legitimate, non-discriminatory reasons for setting Long's salary increase at the 3.5 percent level. The burden now shifts back to Plaintiff to provide proof sufficient for a jury to disbelieve those reasons.

### 3.    Plaintiff's Case for Pretext

In order to defeat Defendant's Summary Judgment Motion, Long must provide evidence that these reasons are at least "unworthy of credence." Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 147 (2000). Plaintiff asserts that each of Payerli's proffered reasons for her salary increase are pretextual.

His first proffered reason is that he concluded that her position was redundant. Plaintiff responds that this conclusion might have been relevant to the termination decision, but it should not have been relevant to the salary increase decision because it was not specified in the Defendant's salary guidelines for 2001. Additionally, Plaintiff notes that Payerli gave Crystal Wells a salary increase within the guideline range even though he later concluded that her position should be reorganized and a lower level employee should fill that position. A determination that a position is no longer needed would be a valid concern when setting salary increase levels, but the increase Payerli gave to Wells casts doubt on Payerli's position that he considered this factor when setting salary increases for his employees.

Payerlis' next proffered reason is that he disagreed with her performance rating from the

12

previous year. Here, Plaintiff points out that Payerli reviewed and approved of Long's review from 2000. If Payerli's disagreement with Kennett's review of Long's performance were serious enough to justify a lower salary increase, Plaintiff asserts that Payerli would not have signed the performance review. Additionally, Plaintiff highlights that Payerli never supervised Long nor reviewed any of her work prior to becoming Interim VP. Since Defendant concedes Payerli never reviewed Long's work product, it is difficult to understand the basis for Payerli's strong disagreement with her performance review. Once again, Plaintiff's position casts some doubt on the legitimacy of Payerli's proffered reason.

The final reason Payerli proffered for Plaintiff's salary increase is that he needed to conserve money to stay within the overall four percent cap. Plaintiff suggests that this reason, too, is pretextual because Payerli was $10,841.24 under budget for salary increases for 2001. Long's annual salary for 2000 was $55,389.60. With the 3.5 percent increase that Payerli approved, Long's annual salary for 2001 rose to $57,328.64. If her salary had gone up by 4 percent (which would have been within the guideline range), it would have cost the company an additional $276.54. While Payerli might have been genuinely concerned about remaining within the four percent salary cap for his department, the budgetary excess for salary increases provides a legitimate reason to doubt whether that actually motivated his decision to set Plaintiff's salary increase at 3.5 percent.

Finally, Plaintiff notes that Payerli did not follow the proper internal procedures in setting her salary increase for 2001. Defendant admits that Long's salary increase should have been reviewed and signed by Musacchio and that Musacchio did not sign Long's salary increase. The space on the form for his signature contains two sets of initials, but the identity of the initialers is

13

not disclosed in the record. Payerli's failure to follow the Defendant's internal procedures further supports Plaintiff's position that his proffered reasons were pretextual.

### 4. Conclusion on Salary Increase Claim

Plaintiff has made out a prima facie case of race discrimination in connection with her 2001 salary increase. She has also met her burden of demonstrating a genuine issue of material fact as to whether the proffered reasons for the increase were pretextual. Consequently, the Defendant's Summary Judgment Motion on this claim must be denied.

### B. Claim of Race Discrimination in Termination

Plaintiff claims that she was terminated because of her race. Defendant contends that this claim must be dismissed because it was not included in her EEOC charge of discrimination. Defendant additionally contends that Long can establish neither a prima facie case of race discrimination nor that its proffered reasons for terminating her were pretextual. The Court will first address the contention that the claim must be dismissed.

### 1. Dismissal for Failure to Include in the EEOC Charge

In employment discrimination cases, the Plaintiff is required by statute to first file a charge of discrimination with the EEOC. If the Plaintiff fails to file a timely charge of discrimination with the EEOC, her claims cannot be heard in the district court. Similarly, if the Plaintiff does not present certain claims in her EEOC charge, she cannot raise those claims in the district court "unless the claim is reasonably related to one of the EEOC charges and can be expected to develop from an investigation of the charges actually raised." Green v. National Steel Corp., Midwest Div., 197 F.3d 894, 898 (7th Cir. 1999).

In Plaintiff's EEOC Charge of Discrimination, she only presented three claims: (1) that

her salary increase for 2001 was a result of race discrimination; (2) that she was terminated in retaliation for complaining of race discrimination; and (3) that she was terminated because of her age. Plaintiff must concede that the charge that her dismissal was based on race discrimination was not present in her EEOC Charge.

The question becomes, therefore, whether the claim that she was terminated because of her race is "reasonably related to [any] of the EEOC charges and could be expected to develop from an investigation of the charges actually raised." Green, 197 F.3d at 898. In this case, the Court finds that the claim that Long was terminated because of her race is related to the claims in the charge that her salary increase was based on race discrimination and that her firing was in retaliation for her claim of race discrimination. It is clear that a charge of unlawful retaliation is not the same as a charge of unlawful race discrimination, but in this case the two are related to one another. If the EEOC had investigated Plaintiff's charges of race discrimination and retaliation, the investigation would have led them to the documentation that Plaintiff submitted to the AMA in connection with her complaints of race discrimination relating to the differential retention and termination of support personnel by race when their supervisors were fired.[4] This evidence could trigger investigation of whether her termination had been due to racial discrimination. Additionally, Plaintiff's complaints of race discrimination in connection with her salary increase made race discrimination very much a part of the EEOC charge. Finally, the complaint of race discrimination in her termination implicates the same actors (primarily Payerli, but also Rhodes, Evans, and Musacchio) and the same conduct (termination) as the retaliation

---

[4]Plaintiff submitted a list to the Defendant asserting that white employees in executive support positions had either retained their positions or obtained other positions when the executive they supported was terminated, but that African-American employees in similar positions had their positions terminated.

15

claim in her EEOC charge. In this case, the claim that she was terminated on account of her race could be expected to develop from the claims in her EEOC charge.

All of the cases that Defendant cites where the absence of a claim in an EEOC charge has mandated dismissal are distinguishable from the case at hand. See Cheek v. Western & S. Life Ins. Co., 31 F.3d 497, 501 (7th Cir. 1994); Rodgers v. Arlington Heights Sch. Dist. No. 25, 171 F. Supp. 2d 773, 777–78 (N.D. Ill. 2001) (Coar, J.); Ekanem v. Health & Hosp. Corp. of Marion County, Ind., 724 F.2d 563, 573 (7th Cir. 1983); Smith v. Rush Presbyterian-St.Luke's Med. Ctr., No. 01 C 4971, 2001 WL 1035239, at *2 (N.D. Ill. Sept. 10, 2001); Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir. 1992). In Cheek, the Plaintiff's judicial complaint implicated different conduct and different actors than her EEOC charge. See Cheek, 31 F.3d at 501. In Rodgers, the Plaintiff's EEOC charge alleged that she received fewer assignments based on her race and sex and her judicial complaint alleged different and much broader conduct. Rodgers, 171 F. Supp. 2d at 777 (complaint alleged that "she was terminated, denied a promotion, harassed, and paid a lower salary" on account of her race and sex). Ekanem is an older (1983) class action case where none of the class plaintiffs had alleged in their EEOC charge that the pay scale was discriminatory; again this is different conduct. In Smith, the Plaintiff did not present any retaliation claim in the EEOC charge, so the retaliation claims were foreclosed in the district court. See Smith, 2001 WL 1035239, at *2 (N.D. Ill. 2001). Finally, in Rush, the Plaintiff's EEOC charge complained of race discrimination generally and termination specifically; the Court held that was insufficient to support a judicial complaint for racial harassment in the workplace because the conduct is much different. See Rush, 966 F.2d at 1111–12.

The difference between this case and all the cases that Defendant cites is that the conduct

16

and the actors in the EEOC charge and the judicial claim are the same. For the reasons outlined above, the Court holds that the Plaintiff is not foreclosed from presenting her race discrimination in termination claim in this forum.

## 2. Race Discrimination in Termination

Plaintiff contends that her position was eliminated and she was eventually terminated because of her race. Defendant concedes that Plaintiff was a member of a protected class who was meeting her employer's expectations and received an adverse employment action. Once again, the only dispute centers on the fourth element of the prima facie case. Where the plaintiff's position is eliminated, in order to make out the fourth element of the prima facie case, the "plaintiff [must] demonstrate that h[er] duties were absorbed by employees who were not members of the protected class." Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 693 (7th Cir. 2000).

### a. Plaintiff's Prima Facie Case

When Plaintiff's position was eliminated, some of her duties were eliminated. (Def. Statement Facts, ¶40.) Some of her administrative duties were absorbed by Christine Hearne, a white woman. (Id., ¶39.) According to notes of an April 12, 2001 meeting between Payerli and Evans, Hearne was slated at that time to take over 40 percent of Long's job responsibilities. (Pl. Statement Add'l Facts ¶ 198.) The parties disagree whether any other employees absorbed Long's remaining duties. Defendant asserts that Jim Clinton (white), Maureen Archey (African-American), and Millette Jackson-Bates (African-American) each assumed some of Long's duties. It is Defendant's position that "because half of the individuals who assumed [Long's] job duties were in the protected class, she cannot show that her duties were assumed solely or even

17

primarily by employees outside the protected class." <u>Kahzinsky v. William W. Meyer & Sons, Inc.</u>, No 02 C 7254, 2003 WL 22735867, at *5 (N.D. Ill. Nov. 19, 2003)

Plaintiff disputes whether any of these three employees actually absorbed any of her duties. The record evidence indicates that in April 2001, Payerli told Evans that her duties would be divided among a number of individuals. At his deposition, Payerli testified that Clinton was going to take over Long's human resources duties; Jackson-Bates was going to take over "perhaps the international licensing"; and he did not recall which duties Archey was going to take over. (Def. Appendix, Tab C, at 232–33.) At the June 1, 2001 meeting where Long learned her position was going to be eliminated, Long recalled that Payerli "indicated [her duties] would be delegated to Christine Hearne . . . [and] he made mention of human resources or some other aspect of [Long's] position being delegated to someone else." (Pl. Appendix, Tab A at 165.)

The only certainty from this record evidence is that Christine Hearne absorbed many of Plaintiff's job duties. It also appears likely that Jim Clinton absorbed the human resources duties Plaintiff had been performing. The Defendant has not established that Jackson-Bates or Archey actually assumed any of Plaintiff's duties, merely that Payerli intended that they might assume some of them. Defendant asserts that this should not matter because "the burden is on her . . . to demonstrate a prima facie case." (Def. Reply Mem. L. Supp. Mot. Summ. J. at 9.) At trial, this is certainly true. But the Defendant is seeking summary judgment on Plaintiff's claim at this point, so the burden is on it to demonstrate an absence of factual issues if it wants to prevail. As it stands, there is a genuine question of material fact about which employees absorbed which of Plaintiff's duties. As noted above, the clearest evidence is that Christine Hearne absorbed many

of them. Because Christine Hearne is outside of the protected class, the Court finds for the purposes of this motion that Plaintiff has established the fourth element of the prima facie case.

**b.  Defendant's Non-Discriminatory Reasons**

The Defendant must set forth legitimate non-discriminatory reasons for the position's elimination. The Defendant asserts that it was trying to reorganize its Publishing Department. Pursuant to this reorganization or restructuring, Defendant contends that Payerli reorganized the position of Crystal Wells, a white employee, and Payerli recommended the discharge of Jim Skowrenski, another white employee. Payerli also eliminated Plaintiff's position. The Defendant's proffered reasons for eliminating Long's position are that the organization was looking to conserve resources, Payerli believed Long's position was redundant, and all of Payerli's direct reports told him that Long was not a contributor to the team.

**c.  Plaintiff's Case for Pretext**

Plaintiff asserts that these reasons were pretextual. First, she points to a contradiction in the record evidence about the reasons her position was eliminated. Payerli testified at his deposition that Musacchio told him two things: "solve the Erma Long problem" (Pl. Appendix, Tab G at 27) and "in no uncertain terms, he felt that Erma Long, you know, should be removed." (Pl. Appendix, Tab G at 32). Musacchio denied ever making any such directive. Unsurprisingly, the Defendant does not rely on Musacchio's directive as part of the reasons for Long's removal in this motion, but the dispute in the record casts some doubt on the proffered reasons.

Regarding the money saving aspects of Long's elimination, Plaintiff notes that Payerli did not eliminate any other positions in the Publishing Department nor did he terminate any other employees in the Publishing Department. Wells' job reorganization does provide support for this

proffered reason, but the fact that she was a white employee and her position was not eliminated buttresses the inference Plaintiff seeks that she was terminated because of her race. Payerli's recommendation that Skowrenski be terminated is of no value here because at the time Payerli became Interim VP, Skowrenski was no longer employed with Defendant. (Pl. Appendix, Tab G at 106.) Additionally, Plaintiff notes that there is evidence in the record that Payerli's supervisors felt that the changes Payerli was making in the department (including Long's termination) were of little value in terms of saving money.

With regard to Payerli's belief that Long's position was redundant, there is little in the record to support that assertion beyond Payerli's testimony. The Defendant admits at this stage that its Human Resources Department would require documentation to support the elimination of an employee's position. Rhodes notes from her May 14, 2001 meeting with Payerli reflect that she discussed the need for documentation with Payerli. Musacchio does not recall whether he received any documentation to support the elimination. (Pl. Appendix, Tab E at 77.) The Defendant has not submitted any documentation along with its summary judgment motion.

Defendant's final proffered reason for Long's elimination is that none of Payerli's direct reports thought she was a contributor to the team. Plaintiff testified that she recalled one of those direct reports, Peter Murphy, told Payerli that Long's skills and knowledge would certainly benefit Payerli in the position. (Pl. Appendix, Tab E at 135.) Additionally, if Plaintiff's performance was the issue, the Defendant had a comprehensive process to deal with underperforming employees. Payerli took no steps to engage Plaintiff with this process.

d.      **Conclusion on Race Discrimination Termination Claim**

Plaintiff established a prima facie case of racial discrimination for the purposes of

20

summary judgment. Defendant's lack of compliance with its own procedures in eliminating Plaintiff's position and the discrepancies in the record about the actual reason for Plaintiff's termination create a genuine question of fact whether the proffered reasons are legitimate or pretextual. Consequently, Defendant's motion for summary judgment on this claim must be denied.

## IV.    LONG'S RETALIATION CLAIM

Plaintiff contends that Defendant decided to eliminate her position in retaliation for her complaints of race discrimination relating to her salary increase. Defendant responds that it would be impossible for the decision to have been retaliatory because "Payerli made the decision to eliminate her position by April 12, 2001, over two weeks before Long engaged in any protected activity."

The evidence in the record provides clear support for Defendant's position that the decision to eliminate her position was made before May 1. Payerli met with Peggy Evans on April 12, 2001 to discuss his beliefs about Long. Evans' notes from the meeting clearly reflect that elimination of her position was the topic of the meeting. The notes indicate "position elimination", "[Payerli] doesn't need job", and "April 30th, Erma's last day." (Pl. Appendix, Tab D, Ex. 3.) Additionally, Evans testified with certainty at her deposition that she knew before May 1 that Long's position was going to be eliminated. (Pl. Appendix, Tab C at 103–03).

Plaintiff seeks to defeat summary judgment because the record is ambiguous with respect to when Payerli discussed Long's elimination with Musacchio. This ambiguity is insufficient to overcome the compelling evidence cited above that the decision had already been made. Since the decision to eliminate Long's position was made prior to her engaging in any protected

activity, the Defendants are entitled to summary judgment on this claim.

## IV.    LONG'S AGE DISCRIMINATION CLAIM

Plaintiff contends that the Defendant terminated her because of her age. At the time of

Plaintiff's termination, she was forty-nine years old. Plaintiff makes no effort to provide direct

evidence of age discrimination in this case. Therefore, her age discrimination claim can proceed

to a jury, if at all, only under the indirect method of proof outlined in the standards section above.

### A.    Plaintiff's Prima Facie Case

The Defendant contends that Long cannot establish a prima facie case of age

discrimination in this case. The parties do not dispute the first three elements of the prima facie

case. It is clear that Long's age falls into the range protected under the Age Discrimination in

Employment Act. See 29 U.S.C. § 631(a) (protection is limited to "individuals who are at least

40 years of age"). The record contains sufficient evidence to establish that Long was meeting her

employer's legitimate expectations. Her termination is ipso facto an adverse employment action.

The only question is whether younger employees were treated more favorably. Where the

plaintiff's position is eliminated, in order to make out the fourth element of the prima facie case,

the "plaintiff [must] demonstrate that h[er] duties were absorbed by employees who were not

members of the protected class." Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687,

693 (7th Cir. 2000). In order for the absorbing employees to be outside of the protected class,

they must be at least ten years younger than Plaintiff. See Hartley v. Wisconsin Bell, Inc., 124

F.3d 887, 893 (7th Cir. 1997).

When Plaintiff's position was eliminated, some of her duties were eliminated. (Def.

Statement Facts, ¶40.) Some of her administrative duties were absorbed by Christine Hearne, a

22

thirty-five year old woman. (Id., ¶39.) According to notes of an April 12, 2001 meeting between Payerli and Evans, Hearne was slated at that time to take over 40 percent of Long's job responsibilities. (Pl. Statement Add'l Facts ¶ 198.) The parties disagree whether any other employees absorbed Long's remaining duties. Defendant asserts that Jim Clinton (age 40), Maureen Archey (age 32), and Millette Jackson-Bates (age 34) each assumed some of Long's duties. Archey and Jackson-Bates are both outside of the protected class, while Clinton is inside fo the protected class.

Plaintiff disputes whether any of these three employees actually absorbed any of her duties. The record evidence indicates that in April 2001, Payerli told Evans that her duties would be divided among a number of individuals. At his deposition, Payerli testified that Clinton was going to take over Long's human resources duties; Jackson-Bates was going to take over "perhaps the international licensing"; and he did not recall which duties Archey was going to take over. (Def. Appendix, Tab C, at 232–33.) At the June 1, 2001 meeting where Long learned her position was going to be eliminated, Long recalled that Payerli "indicated [her duties] would be delegated to Christine Hearne . . . [and] he made mention of human resources or some other aspect of [Long's] position being delegated to someone else." (Pl. Appendix, Tab A at 165.)

The only certainty from this record evidence is that Christine Hearne absorbed many of Plaintiff's job duties. There is a genuine issue of material fact as to which employees absorbed which of Plaintiff's duties. Viewing this evidence in the light most favorable to the Plaintiff, the Court concludes that the Plaintiff has made out a prima facie case of age discrimination for the purposes of this motion.

## B. Defendant's Non-Discriminatory Reasons

After establishing a prima facie case, the burden shifts back to the Defendant to establish a non-discriminatory reason for terminating Long. The Defendant asserts that Long's position was eliminated "because Payerli concluded that her job was redundant, many of her duties could be eliminated or absorbed by others, and it would result in a monetary saving for the Publishing Department." (Def. Mot. Summ. J. at 13.) This is a legitimate non-discriminatory reason.

## C.    Plaintiff's Case for Pretext

The burden shifts back to the Plaintiff to present evidence that would be sufficient to support a jury finding that the Defendant's proffered reason was a pretext for age discrimination. The Plaintiff cites the same evidence of pretext discussed above in context of the race discrimination termination claim. But there is a crucial difference between the race discrimination claim and the age discrimination claim. At the time Payerli made the decision to terminate Long's position, he knew that she was African-American; he did not know her age.

When evaluating whether the proffered reasons are pretextual, it is imperative to bear in mind what this pretext is allegedly covering up. In this claim, the Plaintiff must be able to persuade a jury that the actual reason she was fired was because of her age. Where there is no evidence that the decision-maker knew her age or even knew that she was significantly older than the employees who allegedly absorbed her duties, no reasonable jury could return a verdict for the Plaintiff on her age discrimination claim.[5] Consequently, summary judgment must be granted to the Defendants on this claim.

---

[5] This might not be the case if the difference between Plaintiff's age and the age of her replacements was greater. It might also not be the case if there was evidence that Plaintiff's age was apparent from her appearance in some way. There is no such evidence in this case.

## V.     CONCLUSION

For the reasons set forth above, the Defendants motion for summary judgment is granted in part and denied in part. The Plaintiff will proceed to trial on her claims that her salary increase in 2001 resulted from racial discrimination and that her termination resulted from racial discrimination. The Defendant is entitled to summary judgment on Plaintiff's retaliation claim and Plaintiff's age discrimination claim.


**Enter:**

_____
**David H. Coar**
**United States District Judge**

**Dated: May 14, 2004**